# THE WARRINGTON HOUSE, INC. v DEPARTMENT OF HEALTH AND REHABILITATIVE SERVICES

## Case No. 88-0171

State of Florida, Division of Administrative Hearings

November 9, 1988

### APPEARANCES OF COUNSEL

**Michael Mathis,** Staff Attorney, Department of Health and Rehabilitative Services, for respondent.

**Tracie Jackson** and **Francis Cooper,** pro se.

### OPINION OF THE COURT

DIANE CLEAVINGER, Hearing Officer.

### *RECOMMENDED ORDER*

This action came on for hearing in Pensacola, Florida, before the Division of Administrative Hearings' duly designated Hearing Officer, Diane Cleavinger, on the 6th day of May, 1988.

The issue addressed is whether Respondent is guilty of multiple and repeated violations of Chapter 400, *Florida Statutes* and/or rules adopted pursuant thereto, the sufficiency of which justifies Respon-

dent's refusing to renew Petitioner's license pursuant to Section 400.414, *Florida Statutes.*

At the hearing, Petitioner called two witnesses. The Respondent called five (5) witnesses and introduced seventeen (17) exhibits. Additionally, Respondent agreed that regardless of the style of the case it would have the burden of proof in this matter.

Petitioner and Respondent submitted proposed findings of fact and conclusions of law on August 12, 1988 and August 8, 1988, respectively. Petitioner's and Respondent's findings of fact have been considered and utilized in the preparation of this recommended order, except where such proposals were not supported by the weight of the evidence or were immaterial, cumulative or subordinate. Specific rulings on the parties' proposed findings of fact are contained in the appendix to this recommended order.

## FINDINGS OF FACT

1. At all times, material to this case, Petitioner has been licensed by the Department to operate an adult congregate living facility (ACLF) which is located at 6200 West Fairfield Drive, Pensacola, Florida, and is known as The Warrington House. Francis Cooper is the sole shareholder and operator of the Warrington House.

2. Prior to 1984, The Warrington House was known as The Heritage House and was owned by a Mr. Mitchell. Sometime in 1984, Mr. Mitchell was criminally charged with elderly abuse on his residents and The Heritage House went into receivership. Another branch of HRS who was represented by Esther Ward, asked Ms. Francis Cooper to take over the facility. HRS was apparently well satisfied with Ms. Cooper's qualifications in running an ACLF since she had another such facility.

3. When Ms. Cooper took over the Heritage House the electrical power to the facility was about to be turned off. Only by Ms. Cooper's pleading with Gulf Power was that circumstance forestalled. There were only thirteen (13) patients at the facility out of the sixteen (16) that were supposed to have been there. Three (3) of the patients had been mysteriously removed during the night. The residents that were at the house could not identify themselves and very few resident records were at the facility. The building was infested with roaches, there was raw sewage in the yard and the sewage system was completely blocked to the extent that sewage came up through the showers when a toilet was flushed. There was urine in every carpet. None of the appliances in the house worked. There were no air conditioners, fans or plastic

168

dishes. The floors were in bad shape. In fact, Ms. Cooper fell through two of the bathroom floors. When Ms. Cooper questioned HRS representatives about the appalling conditions of the facility, she received no responsive answer. After Ms. Cooper had taken over the facility, she discovered that Mr. Mitchell had absconded with three months advance rent from the residents. Ms. Cooper, therefore, had to operate the premises for three months without income from the residents that were there. She used her own money.

4. Ms. Cooper started with the air conditioning, flooring and carpeting. All these items were replaced. The bathrooms were tiled and additional bathrooms were added. She put in a $6,000.00 sewage system, a lift station and paid $1,000.00 to hook the building onto city sewage. She also brought in an exterminator to get rid of the bugs. All of this took place over a period of two years wherein Ms. Cooper worked diligently to bring the building up to "snuff." In fact, in the time since she has had the facility she has accomplished wonders in improving conditions at the house. These conditions clearly did not appear overnight, but over several years and were apparently over-looked by Respondent until the crisis with Mr. Mitchell had occurred.

5. Ms. Cooper went into the house with the understanding that the corporation would eventually build another facility and close what had become The Warrington House. The reason for the new construction was that the current building, regardless of the amount of repair, was still an old building not worth maintaining and which was allowed to deteriorate badly prior to her stewardship. However, due to a falling out with her brother, who was then a co-shareholder of the corpora-tion, Ms. Cooper was unable to complete her plans for moving the residents of The Warrington House to a new facility. She continues to attempt to obtain financing to build a new facility.

6. At least once a year, HRS does a full survey on a ACLF like The Warrington House. A full survey is simply an inspection of the property in order to determine the degree of compliance with HRS rules and regulations. Upon completing the inspection, the inspector goes through an exit briefing with the ACLF's management. During the exit briefing, the inspector will go over any deficiencies he or she has discovered and attempt to establish mutually agreeable correction dates. The inspector also explains that these time periods are the best estimates that they can come up with at that point to allow a reasonable amount of time for the required corrections to be made. If any problems should arise, the inspector requests that the manager communicate with his or her office and ask for an extension. Exten-sions are not always forthcoming.

**169**

7. After the full survey inspection is done, a follow-up visit is normally scheduled to determine whether the earlier cited deficiencies have been corrected. If, after the follow-up survey there are items that are still not corrected, the inspector will explain to the person in charge that they are subject to administrative action and that he or she will report the facility's noncompliance to his or her office. Whether or not administrative action is taken is determined at a level above the inspector. However, it appears that the customary practice of the office is to pursue an administrative fine for any noncompliance after the correction date has been passed.

8. After the first follow-up survey has been made it depends on the particular factual situation whether or not further follow-up surveys are made until compliance is achieved. If there are efforts being made to correct the problems further follow-up surveys will be made. If not, further follow-up surveys may not be made.

9. In this case, James Temkin, an HRS Fire Protection Specialist, performed a full survey fire safety inspection on The Warrington House on September 24, 1986. During that survey, he cited 11 deficiencies. Various compliance dates were established for the deficiencies. A follow-up survey was conducted by Mr. Temkin on January 14, 1987. During that survey, he noted that 6 of the previously cited deficiencies had not been corrected. He recommended administrative action on all the uncorrected deficiencies. The six remaining uncorrected deficiencies were as follows:

(a) No up to date fire plan and the July 7th fire drills were not documented;

(b) No fire alarm test since July 1986 and fire alarm zones were not shown on the actuator panel;

(c) Smoke detectors not working in four (4) rooms;

(d) Exit sign lights burned out at the front and center exits, emergency lights not working at the front, rear and upstairs exit halls;

(e) Sleeping rooms had hollow core doors; and

(f) There was no documentation of fire safety on the wood paneling and tile ceilings on the first and second floors.

All other deficiencies cited during the September 24, 1986 full survey were corrected.

10. As to the alleged deficiencies contained in the latter half of (b) and (c)-(f) above, none appear at any point in HRS' rules governing

170

ACLF's. Supposedly, these deficiencies are cited in the NFPA life safety code, which is incorporated by reference in the Fire Marshal's rule on ACLF's, Rule 4A-40, *Florida Administrative Code.* The 1984 version of Rule 4A-40, *Florida Administrative Code* is incorporated by reference in HRS' rule, Rule 10A-5, *Florida Administrative Code.* Both HRS' rule and the Fire Marshal's rule are contained in the Florida Administrative Code. However, the 1984 version of NFPA is nowhere to be found in the Administrative Code. The current Fire Marshal's rule adopts portions of the 1985 NFPA life safety code. However, the HRS' rule adopts the 1984 version of the Fire Marshal's rule. No showing was made by Respondent as to what the 1984 version of the NFPA code contained. The HRS' inspector's testimony regarding a particular deficiency's inclusion in the NFPA cannot be relief on since both inspectors apparently used the 1985 version of the NFPA which is not the 1984 version included in HRS's rule. Without proof of the contents of the NFPA, HRS has failed to prove any deficiencies for which it may take administrative actions.

11. As to the other deficiencies, attempts to comply were in fact made by The Warrington House. The facility's personnel in fact thought they had complied with HRS' desires based upon previous inspections. However, for one reason or another, these attempts were rejected by the HRS inspector and the deficiency was cited again, but because of another reason. The lack of an up-to-date fire plan (cited in (a) above) was met by The Warrington House when they obtained a fire plan prior to the established correction date from another arm of HRS responsible for devising such plans. However, upon the January 14th follow-up inspection, the plan obtained from HRS by Petitioner was considered insufficient in that it did not outline staff responsibilities during a fire. The same thing occurred with the lack of fire alarm tests, cited in the latter part of (a) and the first part of (b) above. The Warrington House obtained the testing document and test from another branch of HRS responsible for such testing. However, the inspector at the follow up survey did not deem his own agency's testing documents sufficient since it did not show a different type sending unit was being tested at least once a year.[1] These are simply not repeat deficiencies since in each instance the earlier grievance had been met and it was another grievance which cropped up.

12. On July 9, 1987, a second follow-up survey to the Temkin September 24, 1986, full survey was performed by O.B. Walton, an

---

[1] Moreover, the different sending unit requirement does not appear in any of HRS' rules; and therefore, the lack of such information is not a violation under the rule.

**171**

HRS fire safety inspector. The evidence was not clear as to any remaining uncorrected deficiencies, if any, he found. Therefore, Respondent failed to establish any repetitive deficiencies as a result of the July 9 follow-up survey.

13. Apparently, however, Mr. Walton, did perform another full survey on July 9, 1987. Several additional deficiencies were cited by him. A follow-up visit was conducted by Mr. Walton on October 23, 1987. Four alleged deficiencies remained uncorrected as follows:

(a) Ceiling not repaired in hot water heater closet, i.e. not taped;

(b) Kitchen fire door latch was jammed open so it would not latch, but it would stay closed;

(c) Plug by hot water heater had no cover;

(d) No documentation that drapes were fire retardant.

14. Again, none of the above alleged deficiencies appear in HRS' rules or in the fire marshal's rule and a reasonable person could not glean from any of the other provisions contained in HRS' rules that the above conditions might be included in these provisions. The lack of clarity or uniformity in interpretation of HRS' rules is especially born out in this case since two different inspectors while inspecting the same building cited different deficiencies under their respective interpretation of the rules. When the experts differ it is difficult to see how a reasonable lay person could even begin to know or understand the contents of HRS or the Fire Marshal's rules. This lack is especially true since the relevant contents of the 1984 NFPA life safety code are not contained in the Florida Administrative Code and were not demonstrated by HRS. HRS, therefore, failed to prove any repeat deficiencies from the October 23, 1987 follow-up survey.

15. A third fire safety follow-up visit was conducted by Pat Reid, a human services program analyst, on January 21, 1988. She has no expertise or license to perform fire safety inspections. She found all of the earlier cited uncorrected deficiencies corrected except for the documentation on the drapes. That alleged deficiency was partially corrected since Petitioner was replacing the drapery with metal blinds. However, as indicated earlier the lack of documentation for fire retardant drapes was not proven to be a violation by Respondent.

16. Ms. Reid had previously conducted a full survey of Petitioner on August 17 and 18, 1987 in her area of expertise operation and general maintenance of an ACLF. Several deficiencies were cited and correction dates were established. Ms. Reid conducted a follow-up survey to the August 17 and 18 full survey on October 23, 1987. The following alleged deficiencies had not been corrected:

172

(a) Facility staff do not have documentation of being free of communicable diseases;

(b) The physical examination (Health Assessment) of resident identified as M.B. does not indicate that the resident is free from communicable disease;

(c) Broken or cracked window panes in windows of second floor exit door, both first floor bathrooms nearest kitchen, and resident rooms identified as C.W., W.S., and W.L.;

(d) Shower tile missing in second floor bathroom nearest exit door;

(e) Linoleum of first floor bathroom is loose as well as badly stained with cigarette burns;

(f) Hole in wall next to sink and toilet of second floor bathroom nearest exit door and square hole in wall of second floor blue bathroom;

(g) Faucet of first floor bathroom is loose;

(h) carpeting in first floor resident room (#7) is badly stained;

(i) Three vinyl chairs in dining room have tears, exposing foam padding;

(j) Second floor bathroom faucet nearest exit does not clearly distinguish between hot and cold water taps.

17. As to the alleged deficiency contained in (a) above, the regulations do not contain a requirement that any documentation be kept regarding staff members being free of communicable disease. The regulations only require that the facility administrator assure that staff is free of communicable disease. The evidence showed that Petitioner had in fact assured that the staff was free of communicable disease. Therefore, no violation occurred.

18. The alleged deficiency cited in (b) above does constitute a violation of Rules 10-5-081(1)(b), (2)(a) 4.d., and (2)(b), *Florida Administrative Code.* However, in this instance, there are several mitigating circumstances. Foremost is the fact that Petitioner attempted on several occasions to obtain this information from another arm of HRS who had M.B. under its care prior to his admission to Petitioner's facility and had actually failed to complete M.B.'s Health Assessment form properly. Petitioner received many assurances from HRS that it would obtain and forward the information. HRS failed to do so. Moreover, after several years of M.B. living at The Warrington House and after several years of HRS care prior to his admission, common sense would dictate that M.B. is free of communicable diseases.

Petitioner has in fact received confirmation of that fact from an examining physician who certified M.B. free of communicable diseases.[2]

19. As to (c) above, the evidence showed that the windows were only cracked and not broken. No evidence was presented as to the severity of the cracks. Cracked windows are not included in Rule 10A-5.022(a), *Florida Administrative Code,* which only addresses broken window panes. Moreover, cracked windows without proof of the severity of the cracks is not sufficient evidence of the lack of good repair or other hazardous conditions similar to those listed in Rule 10A-5.022(a), *Florida Administrative Code.* The Rule requires proof of the hazardous nature of such a condition. Cracked windows are not hazardous in and of themselves and no showing was made that these cracked panes constituted a hazard. Nor do cracked window panes standing alone constitute a violation of Rule 10A-5.022(d). The rule requires evidence that such cracked panes are unreasonably unattractive and no showing was made that the cracks were unreasonably attractive. Likewise, the missing shower tile in (d) above fails to constitute a violation of Rule 10A-5.022(a) since the deficiency is not listed, and no showing was made that the missing tile constituted a hazardous condition. Similarly, the missing tile, by itself, does not constitute a violation under Rule 10A-5.022(d) since no showing was made that the missing tile was unreasonably unattractive.

20. The same failure of proof occurs with the alleged deficiencies listed in (e), (f), (g), (h) and (i). See Rules 10A-5.022(c), (e) and (i).

21. The alleged deficiency cited in (j) above does constitute a violation of 10A-5.023(9)(e). However, the violation was not repeated after October 1, 1987, the effective date of Section 400.414(2)(d), *Florida Statutes.*

22. Ms. Reid conducted a second follow-up survey to the August 17 and 18 full survey when she performed the fire safety follow-up on January 21, 1988. All previously cited deficiencies had been corrected except for:

(a) Facility staff do not have documentation of being free of communicable diseases.

(b) The physical examination (Health Assessment) of resident identified as M.B. does not indicate that the resident is free from communicable diseases.

---

[2] This certification complies with HRS requirements and was obtained by Ms. Cooper with her own funds. M.B. did not have the funds to provide the certification himself.

174

(c) The following maintenance problems exist: broken or cracked window panes in windows of second floor exit door, both first floor bathrooms and resident room identified as W.S.

23. A third follow-up was conducted by Ms. Reid on April 15, 1988. All the previously cited deficiencies had been corrected except for:

(a) The physical examination (Health Assessment) of resident identified as M.B. does not indicate that the resident is free from communicable disease.

(b) Broken or cracked window panes in windows of second floor exit door, both first floor bathrooms nearest kitchen, and resident rooms identified as C.W., W.S. and W.L.;

(c) Shower tile missing in second floor bathroom nearest exit door;

(d) Linoleum of first floor bathroom is loose as well as badly stained with cigarette burns;

(e) Hole in wall next to sink and toilet of second floor bathroom nearest exit door and square hole in wall of second floor blue bathroom.

24. All of the alleged deficiencies cited in the January 21, 1988 follow-up and the April 15, 1988 follow-up survey were carried forward from the alleged deficiencies discussed above, cited in the October 23, 1987 follow-up survey. The same findings are made as to the alleged deficiencies which were carried forward. Only the physical health assessment of M.B. was cited by Respondent and shown to be a repeated deficiency since the information was not obtained by the established correction dates occurring after October 1, 1987. By the date of the hearing all of the above alleged deficiencies had been corrected.

25. Respondent notified Petitioner that it proposed to deny renewal of Petitioner's license to operate The Warrington House on December 23, 1987. The basis for the denial was Section 400.414(1) and (2)(d) which states:

400.414 Denial, revocation, or suspension of license; imposition of administrative fine; grounds.

(1) The department may deny, revoke or suspend a license or impose an administrative fine in the manner provided in chapter 120.

(2) Any of the following actions by a facility or its employees shall be grounds for action by the department against a licensee:

\* \* \*

(d) Multiple and repeated violations of this part or of minimum standards or rules adopted pursuant to this party.

26. The language of Subsection (d) was added to Section 400.414 F.S. on October 1, 1987. Prior to that date Respondent had no authority to take punitive action against the license of an ACLF licensee for multiple and repeated violations of Respondent's statutes and rules. The only action Respondent could take against a facility for such violations was in the form of a civil fine the amount of which could be raised if the violation was repetitive. Section 400.426, *Florida Statutes.*

27. No multiple violations were shown by the evidence through the April 15, 1988 follow-up survey. More importantly, however, no multiple violations were shown by Respondent after October 1, 1987, the effective date of the statutory language at issue in this case. No showing was made by Respondent as to any legislative intent that the statute operate retrospectively. The statute operates only prospectively. Therefore, any alleged deficiencies cited prior to October 1, 1987 are irrelevant for purposes of imposing the punishment contemplated under Section 400.414, *Florida Statutes.*

## CONCLUSIONS OF LAW

1. The Division of Administrative Hearings has jurisdiction over the parties to, and the subject matter of, these proceedings. Section 120.58(1), *Florida Statutes* (1987).

2. Chapter 400, *Florida Statutes,* governs the licensure of adult congregate living facilities.

3. In that regard, Chapter 400 provides that once a license has been issued to an individual demonstrating the required qualifications, the license must be renewed unless good cause for disapproval of a renewal can be demonstrated. Section 400.414, *Florida Statutes.* Accordingly, in a proceeding where the agency is denying renewal of a license, the burden is on the agency to show the applicant is no longer qualified for the license. For all practical purposes, nonrenewal is similar to revocation of an existing license. The agency, therefore, has the burden to prove, by clear and convincing evidence, that the applicant is not qualified for renewal of its ACLF license. *Ferris v Turlington,* 510 So.2d 292 (Fla. 1987).

4. Section 400, *Florida Statutes,* authorizes the Department to take action against any facility found to be in violation of the standards promulgated under the Chapter. The penalties under this Section run from an administrative fine to revocation of the facility's license.

176

5. This case arises out of the Department of Health and Rehabilitative Services' intent to deny renewal of The Warrington House, Inc., Adult Congregate Living Facility license pursuant to Sections 400.412 and 400.414(1), (2), (d), *Florida Statutes.* The grounds cited by the Department were that The Warrington House had multiple and repeated violations which included but were not limited to the findings cited in the surveys and follow-up surveys of January 14, 1987, July 9, 1987, August 17 and 18, 1987, October 14[3] and 23, 1987.

6. Subsection 400.414(2)(d) took effect on October , 1987. The Department failed to show that the legislature intended this newly added penalty to apply retrospectively. The general rule of law is that a new statute or part of a statute operates prospectively only unless the legislature clearly intends retrospective operation. *VanBibber v Hartford Accident & Indemnity Insurance Company,* 439 So.2d 880 (Fla. 1983). Due Process requires such statutory construction.[4] A reading of Section 400.414(2)(d) does not demonstrate any intent on the part of the legislature that this new subsection have retrospective application. The Department made no showing of any such legislative intent. Therefore, the statute can only be construed to operate prospectively from October 1, 1987, can be considered as constituting violations under Section 400.414(2)(d), *Florida Statutes.* Only the follow-up survey of October 23, 1987 is relevant for these purposes.

7. In that regard, the October 23 follow-up involved several alleged deficiencies in the fire safety area. However, none of these deficiencies were proven to be violations of chapter 400 or the rules promulgated thereunder. Primarily, the Respondent failed to prove the contents of the NFPA life safety code. Additionally, the surveyor was not qualified to inspect in the fire safety area. Finally, none of these deficiencies were shown to be repeated after October 1, 1987.

8. The October 23, 1987 follow-up survey also involved several alleged deficiencies in the operation and maintenance of ACLF's. For the reasons stated earlier none of these deficiencies were proven to be violations of Chapter 400 and rule 10A-5 except for the failure to document that resident M.B. was free of communicable diseases and the failure to have the hot and cold water faucets clearly marked.

9. Rule 10A-5.023(9)(e), *Florida Administrative Code,* provides that

---

[3] The evidence did not show any survey or follow-up survey being conducted on October 14, 1987.

[4] Additionally, prohibition against *ex post facto* application of a statute where the penalty is substantially changed from a civil fine to license revocation would require prospective operation.

faucets shall be identified to distinguish between hot and cold water. The evidence showed that Petitioner's facility had one set of faucets which were not clearly marked. However, this violation was not repeated after October 1, 1987, and was in fact corrected.

10. Rule 10A-5.0181(1)(b) and (c), *Florida Administrative Code*, states:

(1) Admission procedures are as follows: Where possible, the report shall become a permanent part of the resident's record.

\* \* \*

(b) Each resident, in accordance with Section 400.426(5), accepted in a facility upon discharge from a state institution shall have been examined by medical personnel of the institution within 30 days prior to the discharge. The designated form, Health Assessment for Adult Congregate Living Facility Care, shall precede the resident to the facility owner or administrator, for utilization in the determination of appropriateness of admission. The medical examination form shall become a permanent part of the record of the resident at the facility.

(c) If a medical examination has not been completed within 60 days prior to the resident's admission to the facility, a license physician, or licensed nurse practitioner shall examine the resident and complete the Health Assessment for Congregate Living Facility Care form within 30 days following the resident's admission to the facility, to enable to facility owner or administrator to determine the appropriateness of admission. A copy of this may be obtained from the Office of Licensure and Certification. The health assessment form shall become a permanent part of the resident's record at the facility.

\* \* \*

11. Rule 10A-5.0181(2)(a)4.d. and (b) states:

(2) Physical Examination Requirements For Prior Admission.

(a) The following information is required, prior to admission to an ACLF:

\* \* \*

4. A separate statement that, on the day the examination is given:

\* \* \*

d. The individual is free from communicable disease.

\* \* \*

(b) If not contained in the physical examination, the owner or

178

administrator shall obtain the above information prior to such admission. Such information shall become a part of the resident's record.

12. In resident M.B.'s case, the Health Assessment form was supplied but not checked in the "absent from communicable disease" box by the HRS branch who filled out the form. Thus, HRS caused the violation of its own rule by not completing the Health form properly. Rule 10-5.0181(1)(b), *Florida Administrative Code.*

13. However, Rule 10A-5.0181(2)(b), *Florida Administrative Code,* requires that if the communicable disease information is not contained in the physical exam the facilities administrator shall obtain such information prior to admission and keep the information as part of the resident's file. In this case, HRS had represented that the required information was available. However, HRS has failed to supply this information to itself or to the facility even after repeated requests from Petitioner. Regardless, Petitioner, by failing to obtain the information by the established correction date committed a technical violation of the regulation. The violation was repeated in the two successive follow-up visits since the information was not obtained by the subsequent correction dates. The information was being requested by Petitioner and finally was obtained at Petitioner's own expense. Because of the above facts and the facts outlined earlier a repeat violation should be recognized. The insignificance of the violation and HRS's own culpability should also be recognized. No penalty or fine should be imposed.

14. Section 400.414, *Florida Statutes,* provides:

400.414. Denial, revocation, or suspension of license; imposition of administrative fine; grounds.

(1) The department may deny, revoke, or suspend a license or impose an administrative fine in the manner provided in chapter 120.

(2) Any of the following actions by a facility or its employee shall be grounds for action by the department against a licensee:

\* \* \*

(d) Multiple and repeated violations of this part or of minimum standards or rules adopted pursuant to this part.

15. The above language requires more than one violation be shown by Respondent. In this case, two very minor violations were shown. The statute also requires that each individual violation be repeated. The Department failed to show by clear and convincing evidence any multiple and repeated violations as late as the date of the hearing.

16. Moreover, even assuming such violations had been proven, the

facts of this case do not demonstrate the type of violations which would call for nonrenewal or revocation of a facility's license. In that respect, the criteria for determining the appropriate penalty under Section 400.419, *Florida Statutes,* are relevant as guidelines to establishing the appropriate penalty under Section 400.416, *Florida Statutes.*

17. The criteria in Section 400.419, *Florida Statutes,* are as follows:

In determining if a penalty is to be imposed and in fixing the amount of the penalty to be imposed, if any, for a violation, the department shall consider the following factors:

(a) The gravity of the violation, including the probability that death or serious physical or emotional harm to a resident will result or has resulted, the severity of the actual or potential harm, and the extent to which the provisions of the applicable statutes or rules were violated.

(b) Actions taken by the owner or administrator to correct violations.

(c) Any previous violations.

(d) The financial benefit to the facility of committing or continuing the violation.

18. In this case, none of the proven violations were serious. Petitioner made good faith efforts to correct the violations and there was no significant financial reason for the facility to continue the violations. Based on the above only a minimum administrative fine would be appropriate. Nonrenewal would never have been warranted.

## RECOMMENDATION

Based on the foregoing Findings of Fact and Conclusions of Law, it is

RECOMMENDED:

That the Department of Health and Rehabilitative Services renew Petitioner's license.

DONE and ENTERED this 9th day of November, 1988, in Tallahassee, Florida.